UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 22-092-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| TAWSIF MOHAMMED TAJWAR and | ) | **MEMORANDUM OPINION** |
| CLAUDIO EVERARDO CABERA, JR., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

A jury convicted Defendants Tawsif Tajwar and Claudio Cabrera of one count of conspiring to launder money in violation of 18 U.S.C. § 1956(h) and one count of promotional money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  [Record No. 223]  The Court denied motions for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure at the close of the evidence.  The defendants have now filed separate motions for a judgment of acquittal or, alternatively, for a new trial.  [Record Nos. 229, 230, 232]  Both motions will be denied.

## I.  Judgment of Acquittal

A defendant seeking a judgment of acquittal "bears a very heavy burden."  *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).  In reviewing a Rule 29 motion, the Court must determine whether, "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United*

*States v. King*, 169 F.3d 1035, 1038-39 (6th Cir. 1999) (citation and internal quotation marks omitted). "The Court does not weigh the evidence, consider witness credibility, or substitute its judgment for that of the jury[]" in making this determination. *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020).

To convict on the conspiracy count, the United States was required to prove that two or more persons conspired, or agreed, to commit the crime of money laundering and that the defendant knowingly and voluntarily joined the conspiracy. *United States v. Garcia*, 259 F. App'x 747, 750 (6th Cir. 2008). To prove the offense of promotional money laundering, the government must establish that the defendant "(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity." *King*, 169 F.3d at 1039 (citation omitted).

### 1. Defendant Tajwar

Tajwar moves for a judgment of acquittal on both counts of his conviction. Regarding the conspiracy count (Count 4), he does not contest that the government proved that a conspiracy to commit money laundering existed. [Record No. 230-1, p. 5] Instead, he argues that the government failed to establish that he was connected to that conspiracy or that the conduct for which he was convicted "promoted the conspiracy goals." [*Id.* at p. 9] Regarding the count of promotional money laundering (Count 7), Tajwar asserts that the government failed to present evidence establishing: (1) the transaction involved property that represented the proceeds of unlawful activity, (2) he knew the property represented the proceeds of some form of unlawful activity, and (3) he acted with the intent to promote the carrying on of drug trafficking.

## A. Background

The United States introduced records of Tajwar's text messages in establishing his extensive involvement in the charged conspiracy. The defendant texted several individuals, including Cristal Peng and an unidentified number, who notified him of opportunities to retrieve large sums of money. And Tajwar inquired about conducting money "pickups" in places such as Charlotte, Chicago, and New York. The text messages indicated that Tajwar requested additional pickup assignments because he was "losing customers every day." Peng notified Tajwar of an opportunity to retrieve $150,000.00 in Kentucky, and he agreed.

Tajwar claims that he participated in the pickups to receive payment for his legitimate business of trading cash for phones. But DEA Agent Troey Stout (Agent Stout) provided an alternative explanation for the defendant's actions, stating that such conspiracy participants commonly used cash to purchase electronics that are sold to drug manufacturers in China, and that the proceeds of such transactions are used to pay cartels in Mexico for their drug deliveries. Agent Stout further testified that, in exchanges of cash for phones, drug couriers like the defendant are often insulated from other conspiracy members to prevent law enforcement from identifying the source of the money involved in the exchange.

Task Force Officer Robert Hart (TFO Hart) testified that, in this case, a money counter given to DeMarcus Nemetz (a coconspirator indicted with Tajwar and who later pleaded guilty) alerted law enforcement to the need for surveillance on January 22, 2022. After initiating surveillance, TFO Hart witnessed Luis Fernando Lara-Garcia and Tyler Ipock (two other coconspirators who pleaded guilty in the case), take money from Lara-Garcia's residence and deposit it in Tajwar's vehicle. Law enforcement stopped Tajwar's car shortly after the exchange and seized the money received from Ipock.

Kentucky State Police Officer Jack Gabriel (Officer Gabriel) assisted with the traffic stop. Officer Gabriel testified that he spoke with Tajwar about his potential involvement in drug trafficking after a drug dog alerted to the odor of narcotics in the vehicle. When Officer Gabriel asked Tajwar about the source of the money found inside his car, Tajwar said on two occasions that he suspected that the money was illegal. Tajwar also stated that he did not know how much money he had received, although he received a text message stating that he would receive $191,000.00. Task Force Officer Elisha Morris (TFO Morris) testified that the defendant provided similarly evasive answers to his questions during the stop. TFO Morris reported that Tajwar claimed that he did not know how much money he had received or how many electronic items he had sold in exchange for the money, and that Tajwar thought the money might have come from an unlawful source.

The defendant's texts from January 22 reflect that he communicated with Peng and someone at an unidentified number in the minutes leading up to the pickup. The unknown number, ending in 8131 (the 8131 number), sent the defendant a bill code that Tajwar would use to verify the transaction and provided the address of the pickup. Minutes before the pickup, the 8131 number messaged Tajwar that the other party to the exchange was approaching and that he was carrying "191 files," interpreted as $191,000.00. Law enforcement later counted the money involved in the exchange, which amounted to $196,870.00.

### B. Discussion

The government presented sufficient evidence to support both charges against Tajwar. The Sixth Circuit has recognized that "[t]he 'knowledge prong[s]' of the money laundering statute can be proven by direct or circumstantial evidence." *United States v. Johnson*, 26 F. App'x 441, 446 (6th Cir. 2001). And it similarly has found that "[c]ircumstantial evidence

alone is sufficient to support a conviction" for promotional money laundering, noting that "[i]t is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *United States v. Reed*, 167 F.3d 984, 992 (6th Cir. 1999) (citation omitted).

Here, the jury was instructed that the government could prove the defendants' knowledge of the money laundering conspiracy "by facts and circumstances which lead to a conclusion that [they] knew the conspiracy's main purpose." [Record No. 222, p. 21] The instructions also provided that the government could prove a defendant's state of mind on either of the charges "indirectly from the surrounding circumstances . . . [including by] what a defendant said, what a defendant did, how a defendant acted, and any other facts or circumstances in evidence that show what was in a defendant's mind." [*Id.* at p. 16]

### i.  Conspiracy to Commit Money Laundering

Direct and circumstantial evidence established that Tajwar knowingly and voluntarily participated in the charged conspiracy. He messaged known and unknown individuals and offered to pick up money in various locations across the country. The 8131 number of an unindicted coconspirator advised the defendant where to pick up money from Ipock, providing real-time communication regarding Ipock's location and the approximate sum that Tajwar would receive. As the government notes, the 8131 number stated that Tajwar would receive "191 files," which approximately equaled the cash law enforcement seized from the defendant's vehicle.

As the government explains, other circumstances surrounding the defendant's interaction with Ipock further support the conclusion that he acted knowingly, including that he "traveled from Michigan to Lexington to meet a complete stranger in a parking lot to receive nearly $200,000 and that he brought a gun with him for his protection." [Record No. 247, p.

9]  The defendant's equivocal behavior while being interviewed by law enforcement, not to mention his incriminating statements to Officer Gabriel, is further proof that he acted knowingly and intentionally.  A reasonable jury could have easily interpreted Tajwar's messages with Peng and the 8131 number, the circumstances surrounding the money pickup, and his statements to law enforcement as proof of knowing and voluntary participation in the charged conspiracy.

The defendant's arguments to the contrary are simply wrong.  First, as the United States correctly notes, it was not required to prove that Tajwar knew the identities of his coconspirators for a jury to convict him on Count 4.  [Record No. 247, pp. 4-5]  The indictment charges the defendant with conspiring to commit money laundering with the named coconspirators "*and with other persons, known and unknown to the Grand Jury*."  [Record No. 53, p. 4 (emphasis added)]  Additionally, as the Sixth Circuit held in *United States v. Rugiero*, a lower court is not required to instruct the jury that multiple conspiracies existed when the defendant did not directly associate with all other members of the charged conspiracy.  20 F.3d 1387, 1391 (6th Cir. 1994).  The court found that the government's proof that the defendant "knew of the existence of others in the charged drug conspiracy" and that he participated in "some act or portion of the conspiracy" is sufficient proof that the defendant participated in the charged conspiracy.  *Id.* at 1392.

Similarly, evidence introduced during the trial of this matter demonstrated that a drug trafficking conspiracy existed, that Tajwar was aware of other members of the conspiracy, and that he participated in a portion of that conspiracy.  Tajwar's meeting with Ipock and conversations with unindicted coconspirators, including Cristal Peng and the 8131 number, connected him to the conspiracy charged in the indictment.

- 6 -

Tajwar's next claim that he cannot be convicted on Count 4 because his "involvement in this matter begins and ends on January 22" is flatly contradicted by the evidence in the record. [Record No. 230-1, pp. 7-8] In addition to Tajwar's meeting with Ipock, the evidence demonstrated that he communicated with unindicted coconspirators on multiple occasions. His text messages seeking to assist with money pickups at various locations in the United States demonstrate that his involvement in the conspiracy extended far beyond his conduct on January 22.

Tajwar also contends that he should be acquitted on Count 4 because the government failed to establish that he received money representing the proceeds of unlawful activity. [Record No. 230-1, pp. 8-9] But again, he is incorrect. TFO Morris testified that a barbershop owned by two coconspirators was used as a front for the conspiracy's drug trafficking efforts; however, that the same barbershop was also "a legitimate business earning legitimate profits." [*Id.* at p. 8] The defendant explains that, because at least some of the barbershop's earnings were lawful, Tajwar must have received some legitimate earnings. However plausible that interpretation may be, the defendant's argument amounts to little more than an empty attempt to substitute his (or his attorney's) opinion of the evidence for that of the jury—a liberty this Court may not take when considering the present motion.

Additionally, the money laundering statute does not require that the entire property involved represent the proceeds of specified unlawful activity. *See, e.g., United States v. Nickson*, 127 F. App'x 770, 773 (6th Cir. 2005) (recognizing that if the government was required to trace funds used in a money laundering scheme on a "dollar for dollar basis," defendants could "evade sanctions by commingling illegal assets with legitimate earnings") (citing *United States v. Bencs*, 28 F.3d 555, 562 (6th Cir. 1994)); *United States v. Conner*,

- 7 -

1991 WL 213756, at *4 (6th Cir. 1991) (table opinion) (same); *United States v. McCoy*, No. 2:17-CR-20489, 2022 WL 507477 (E.D. Mich. Feb. 18, 2022) ("That a banking account is used for legitimate purposes as well as money laundering does not preclude a money laundering conviction."). Instead, evidence is sufficient to support a money laundering conviction if a jury can infer that "the illegally garnered funds were 'involved'" in the alleged transaction. *Nickson*, 127 F. App'x at 773 (citing 18 U.S.C. § 1956(a)(1)) (emphasis added); *see also United States v. Westine*, 1994 WL 88831, at *2 (6th Cir. 1994) (table opinion). And there is no minimum percentage requirement.

In any case, additional evidence supported the jury's conclusion that Tajwar received money representing the proceeds of unlawful activity. In addition to the evidence from the barbershop, the government presented photos from a coconspirator's stash apartment indicating that the money Tajwar received came from drug proceeds. The jury also heard from Officer Gabriel that a drug dog alerted to the presence of the odor of narcotics when officers approached the defendant's vehicle. From that evidence, a rational juror could infer that the $190,000.00 that the defendant received came from an unlawful source.

### ii. Promotional Money Laundering

Tajwar also challenges his conviction for promotional money laundering. Regarding the second element, he claims that the United States did not establish that the money he received from Ipock represented the proceeds of unlawful activity. [Record No. 230-1, pp. 13-14] Similar to the conspiracy charge, the defendant suggests that the proceeds could have come from a lawful source because two of his coconspirators owned a barbershop that earned legitimate profits. [*Id.*] He cites *United States v. McDougald* in support of his claim, in which the Sixth Circuit reversed a defendant's money laundering conviction because insufficient

evidence supported that he knew the source of the proceeds involved in the charged transaction. 990 F.2d 259, 261-62 (6th Cir. 1993).

In *McDougald*, the defendant was charged with using $10,000.00 in drug proceeds to purchase a vehicle for an acquaintance who was a drug dealer. *Id.* at 261. The Sixth Circuit held that proof that the money came from a drug dealer did not necessarily establish that "all of [the drug dealer's] money is drug money or that [the $10,000.00] is drug money" because the acquaintance could have also earned money through legitimate means. *Id.* Additionally, the fact that the defendant registered the car in his own name was insufficient proof of knowledge because "[l]aundering of drug profits is not the only plausible explanation for concealing assets." *Id.* at 262.

Reliance on *McDougald* is misplaced. As with Count 4, the government was not required to trace the origin of all funds that Tajwar received to demonstrate that the alleged transaction involved the proceeds of unlawful activity. *Nickson*, 127 F. App'x at 773. Moreover, the government presented sufficient proof to support the jury's conclusion that Tajwar's coconspirators were "involved in the drug trade and that the money at issue was more likely than not a proceed of that trade." *United States v. Johnson*, 26 F. App'x 441, 447 (6th Cir. 2001). Although the proceeds could have come from legitimate barbershop activities, it is unlikely that the funds being moved came from that part of the business, given the amount of money involved and the steps taken by the coconspirators to transfer it through a third party. *Id.* at 447 (finding that evidence supported that money in laundering transaction represented drug proceeds because "if the money . . . had been from one of these other legitimate businesses . . . it is unlikely that the Defendant would have gone to great lengths to conceal its source; he would simply have deposited the money in [a codefendant's] name *ab initio*"). Additionally,

as mentioned above, a jury could have rationally and logically found that the money constituted drug proceeds in light of the photos from a coconspirator's stash apartment and because a drug dog alerted to the presence of the odor of narcotics inside Tajwar's vehicle.

And the claim that the money did not come from unlawful activity because the government failed to connect the money from the DEA's money counter to the proceeds involved in the pickup also fails. As explained during trial in response to the defendant's motion for a judgment of acquittal, the government did not track the defendants' use of the money counter to "match up dollars," but to determine when and where those involved in the conspiracy used the machine. [Record No. 243, pp. 214-15] The United States was not required to use a money counter or match the serial numbers of the dollars possessed by other codefendants to those received by Tajwar to prove that the money he received directly from co-defendants represented the proceeds of unlawful activity.

Tajwar next contends that the government failed to present evidence that he knew that the money represented drug proceeds. Tajwar acknowledges that he made statements to law enforcement indicating that he "ha[d] a feeling that that money [was] illegal," and that he "[had his] suspicion . . . [that] some kind of shady stuff [was] going on." [Record No. 230-1, p. 15] However, he claims that his statements do not constitute confessions and do not prove that he was aware of the nature of the proceeds at the time he received the cash. [*Id.*]

By claiming that his statements to law enforcement are insufficient proof of his knowledge, the defendant is, yet again, attempting to improperly substitute his judgment (or perhaps the judgment of his attorney) for that of the jury. But it is the jury's job to determine whether the defendant's statements were credible. Additionally, Tajwar seems to forget that the government was not required to present *affirmative* evidence that he knew the money

represented drug proceeds, as the jury was instructed that "no one can avoid responsibility for a crime by deliberately ignoring the obvious." [Record No. 222, p. 17] Tajwar's statements to law enforcement, the circumstances surrounding his interaction with Ipock, the positive alert from a drug dog, and his text messages to Peng could clearly lead a rational juror to conclude that he knew the unlawful nature of the money he received.

Finally, Tajwar's claim that there was no evidence that he acted with an intent to promote the carrying on of drug trafficking is equally unavailing. Tajwar argues that his messages with Peng and the 8131 number establish that he retrieved money from Ipock as payment for phones he sold previously, not to advance his drug trafficking activities. [Record No. 230-1, pp. 16-17] While Tajwar is correct that his conversations with Peng *could* lead to such a conclusion, that same conduct could also lead to a contrary conclusion that his "business" was actually a front for money laundering of illegal drug proceeds. The latter conclusion is certainly reasonable, rational, and logical, in light of Tajwar's messages that he would drive to various locations throughout the country to get cash and his statements to Officer Gabriel that he did not know how many old and/or broken cell phones he had sold or how much money he was owed from those sales to individuals in China.

## 2. Defendant Cabrera

Defendant Cabrera also moves for a judgment of acquittal on his conviction for conspiring to launder drug proceeds (Count 4) and for engaging in promotional money laundering (Count 8). Cabrera concedes that the United States proved the existence of a conspiracy to launder drug proceeds. [Record No. 229, p. 2] However, he argues that his conviction on the conspiracy count should be set aside because the United States did not present evidence that he knowingly and voluntarily joined the conspiracy.

- 11 -

Regarding Count 8, Cabrera maintains that the evidence presented during trial did not establish that he "knew that the money seized from him was the proceeds of some form of unlawful activity" or that he acted with the requisite criminal intent. [*Id.*]

## A. Background

During trial, the United States presented evidence that Cabrera flew to Lexington and received sums of cash from Nemetz on two occasions. DEA Task Force Officer Matthew Dawkins (TFO Dawkins) surveilled Cabrera when the defendant first visited the TownePlace Suites in Lexington on December 20, 2020. The government introduced video footage of Nemetz delivering a gift bag to Cabrera's hotel room around 6:26 p.m. on the night of his visit and leaving the hotel room about a minute later.[1]

The government presented similar evidence regarding Cabrera's second trip to Lexington on February 2, 2021. During this trip, Cabrera was accompanied by a coconspirator, Defendant Ruvi Pacheco.[2] Pacheco stated to a TownePlace Suites employee that she and Cabrera intended to visit family during the visit, but TFO Dawkins noted that the defendants only left the hotel on a single occasion to purchase food. Video footage shows Nemetz arriving at Cabrera's and Pacheco's hotel room around 7:48 p.m. that night, dropping off a Nike bag filled with cash, and leaving minutes later.

---

[1]    Law enforcement officers attempted to intercept Cabrera at the Lexington airport as he was leaving the following morning. However, their efforts to obtain the assistance from Homeland Security in checking Cabrera's luggage on that date were unsuccessful. A K-9 unit apparently was not available on that date.

[2]    Defendant Pacheco also proceeded to trial with Cabrera and Tajwar and was convicted of the charges asserted against her. However, she has not filed a similar, post-trial motion for judgment of acquittal or for a new trial.

TFO Morris spoke with Cabrera and Pacheco at the Lexington airport before those defendants left Kentucky on the morning of February 3, 2021.  Cabrera told law enforcement that he met Nemetz at a Subway restaurant, despite video footage showing that Nemetz visited Cabrera at the TownePlace Suites.  Cabrera also consented to law enforcement searching his luggage after a drug dog alerted to the presence of the odor of narcotics.  Photos of the search established that the defendant's luggage contained $196,870.00 stuffed inside pairs of size 42 and 46 jeans, despite the fact that, as TFO Hart noted, the defendants "mostly [wear] 30 and 32 size pants."  [Record No. 242, p. 81]

The government also presented evidence of the defendants' flight records which indicated that "every single ticket [purchased by Cabrera] was a one-way ticket.  And most of the tickets, the vast majority, were purchased the day before or the day of travel."  [*Id.* at p. 70]

### B.  Discussion

The United States provided ample evidence to support Defendant Cabrera's conviction under Counts 4 and 8.  A rational jury could easily conclude that Cabrera knowingly and voluntarily participated in the charged conspiracy based on his trips to Lexington lasting less than 24 hours, footage of Nemetz briefly visiting the defendant at his hotel on both occasions, and the fact that Cabrera and a co-defendant filled luggage with bundles of cash amounting to almost $200,000.00 during the second trip.  Based on the evidence presented, a reasonable jury could conclude that the defendant knew that the purpose of the conspiracy was to engage in ongoing drug trafficking activities and that he voluntarily joined the conspiracy, helping advance or achieve its goals, when he received money from Nemetz for further transport.  [Record No. 222, p. 20]

Additionally, the government presented sufficient evidence establishing that Cabrera was guilty of promotional money laundering. A rational jury could readily infer that Cabrera knew that the money he received "represented the proceeds of some form of unlawful activity" due to the circumstances surrounding his meetings with his coconspirator. He met with Nemetz for less than five minutes during both trips, and on his second trip he received nearly $200,000.00. Additionally, a reasonable and rational jury could determine based on the evidence that Cabrera acted with an intent to promote drug trafficking activity based on efforts to conceal the money in his suitcase.

## II. New Trial

Both defendants also have moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. [Record Nos. 229, 232] Rule 33 states that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The decision whether to grant a new trial is left to the sound discretion of the district court." *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995) (citation omitted). Moreover, "it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). A moving defendant bears the burden of demonstrating that a new trial is warranted. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994).

### 1. Defendant Tajwar

Tajwar claims that he is entitled to a new trial because the United States failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). [Record No. 232] He asserts that the government violated *Brady* by introducing video evidence of TFO Morris' video-recorded interview with Tajwar without providing audio of the recording.

- 14 -

[Record No. 232-1, pp. 1-2]  Tajwar contends that the failure to provide the audio, which contains both exculpatory and impeachment evidence, prejudiced him because the statements in the recording constituted material evidence establishing his innocence.

*Brady* requires the government to disclose any evidence which is "favorable to the accused, and . . . material to the issue of guilt or punishment." *United States v. Miller*, 161 F. 3d 977, 986 (6th Cir. 1998).  "The *Brady* inquiry has three prongs: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *United States v. Paulus*, 952 F.3d 717, 724 (6th Cir. 2020) (citing *Strickler v. Greene*, 527 U.S. 263 (1999)).

Tajwar claims that the government's failure to provide audio of his recorded conversation with TFO Morris (the audio recording) violated *Brady* because the recording includes exculpatory and impeaching evidence.  He asserts that the evidence is exculpatory because he stated in the recording that he did not know the source of the money he received from Ipock.  [Record No. 232-1, p. 4]  However, as the United States explains in its response, the jury already heard Tajwar's statements that he did not know where the money came from through Officer Gabriel's testimony.  [Record No. 248, p. 8]  Because the content of the audio recording merely reiterates evidence that was already presented, it was not *materially* exculpatory under *Brady*'s first prong.  *See Moldowan v. City of Warren*, 578 F.3d 351, 387 (6th Cir. 2009) (noting that *Brady* imposes an "absolute duty" on the government to disclose "'material exculpatory evidence'" that directly affects the "'fundamental fairness' of a defendant's criminal trial") (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

- 15 -

Tajwar also claims that the audio recording could have been used to impeach TFO Morris' testimony at trial. [Record No. 232-1, pp. 5-6] The defendant identifies three alleged inconsistencies between his statements in the recording and TFO Morris' written report of their conversation. [*Id.*, Record No. 238-1] Tajwar first asserts that TFO Morris misrepresented the defendant's statements when the officer wrote that Tajwar said that he "was going to buy electronics and send them over seas [sic]." He also alleges that TFO Morris' written report indicates that Tajwar identified Cristal Peng as his boss, while the recording does not contain any statement from the defendant to that effect. Finally, he contends that the officer's report states that Tajwar claimed to "pick[] up money where directed because it is payment for his business," although the defendant "never made this statement." [Record No. 232-1, pp. 5-6]

There is no distinction between the statement in TFO Morris' report that Tajwar claimed to sell phones overseas and the defendant's statements in the audio recording. [Record No. 238-1] Tajwar expressly states, "I told you, I sell overseas" during his recorded conversation with TFO Morris, which is wholly consistent with the officer's report. [Record No. 232-2, at 01:29-01:31] Regarding the second purported inconsistency, the United States explains that TFO Morris claimed that Tajwar identified Peng as his boss during an unrecorded portion of their conversation. [Record No. 248, p. 11] And although the defendant does not use the word "boss" in his recorded conversation with TFO Morris, he states that Peng belongs to "the company" that engages in his business of selling phones. [Record No. 232-2, at 02:45-03:00]

TFO Morris' third statement (i.e., that Tajwar picked up money as "payment for his business"), is also consistent with the statements in the recorded conversation. Tajwar shows TFO Morris records of his text messages during their conversation, including invoices and

- 16 -

pictures of used phones, and the defendant states that he messages Peng and others regarding money pickups because they "owe him." [Record No. 232-2, at 03:05-03:55] The defendant does not expressly tell TFO Morris that he received the money for his business, but his conduct during their conversation is consistent with that statement.

But even if the statements in the audio recording do not exactly reflect the statements contained in TFO Morris' report, Tajwar has not demonstrated that the alleged inconsistencies, if presented at trial, would have undermined TFO Morris' testimony to the extent that "the result of [the trial] would have been different." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The audio recording was not materially impeaching or exculpatory and the failure to disclose it did not violate *Brady*.

Additionally, the United States did not suppress the audio recording, "either willfully or inadvertently," because it did not *possess* the evidence. *Paulus*, 952 F.3d at 724. "*Brady* is concerned only with cases in which the government possesses information which the defendant does not." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994); *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."). The government states that it was not aware that the recording contained audio until TFO Morris testified to that effect at trial, but that it provided a copy of the evidence to defense counsel after learning that a version with audio was available. [Record No. 248, pp. 6-7] The defendant has not challenged the United States' account or otherwise alleged that the government withheld the evidence in bad faith. Because the government was not made aware of the audio recording before trial, its failure to provide it earlier in the proceeding did not amount to suppression under *Brady*'s second prong.

- 17 -

Finally, the defendant was not prejudiced by the failure to disclose the recording. First, as noted above, failure to disclose the recording did not affect the outcome of the defendant's trial because Tajwar's statements in the recording were substantively equivalent to his statements to Officer Gabriel. *See Bies v. Sheldon*, 775 F.3d 386, 399 (6th Cir. 2014) (the "proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial.") (citing *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995)).

Failure to disclose the audio recording earlier in the proceeding also was not prejudicial because Tajwar was independently aware of the evidence. "[T]he prosecution is not obligated under *Brady* to disclose information to the defense that the defense already 'knew or should have known.'" *Id.* (citing *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018)); *see also Jones v. Bagley*, 696 F.3d 475, 487 (6th Cir. 2012) (finding no *Brady* violation when the defendant "knew or should have known the essential facts permitting him to take advantage of the information in question."). Tajwar participated in the interview with Morris and, therefore, was aware of the facts underlying their interaction, including any statements that the defendant made. Even if Tajwar did not know that an audio recording of their conversation existed, his attorney was nonetheless able to question TFO Morris regarding the substance of their discussion on cross-examination.

### 2. Defendant Cabrera

Adopting the position taken by Defendant Tajwar during trial, Cabrera now argues that he is entitled to a new trial because the Court erred by summarizing trial testimony in response to a question submitted by the jury. [Record No. 229, p. 3] His counsel explains that, after "more than three (3) hours of deliberations," the jury asked the Court the following question:

Was there a drug dog / K9 unit utilized in the airport search of Cabrera & Pacheco's luggage?  In relation to TFO Hart's testimony on Feb. 2, 2021.

[Record No. 218]  Counsel for all parties opined that the Court should instruct the jury to rely on their collective memory of the testimony, although the United States noted that "there was testimony that Officer Giles' dog, Johan, alerted to the luggage."  [Record No. 244, pp. 9-10]  Counsel for Cabrera agreed that TFO Hart had testified "that a drug dog was present."  [*Id.* at p. 10]  The Court then provided the following response:

Members of the jury,

In response to your first question, let me respond as follows: testimony was presented by TFO Officer Hart that a drug dog/K-9 unit was used in the airport search of Defendants Cabrera's and Pacheco's luggage on February 2, 2021.

Please keep in mind that you should consider the testimony on the issue you raised, together with all other testimony and evidence presented in the case.  Do not consider it by itself, out of context.  Consider all the evidence together as a whole.

[*Id.* at pp. 10, 12]  According to Cabrera, the Court's jury instruction prejudiced his defense and led to his conviction.

Cabrera cites *United States v. Rodgers*, a case in which the Sixth Circuit held that a lower court did not err when it gave the jury the transcript of a witness's testimony.  109 F.3d 1138, 1141 (6th Cir. 1997).  The court recognized the "two inherent dangers" resulting from permitting a jury to read trial transcripts: (1) that the jury "may accord 'undue emphasis' to the testimony," and (2) that the jury "may apprehend the testimony 'out of context.'"  *Id.* at p. 1143.  It remained unconcerned that either danger was present at Rodgers' trial because the jury received the entire transcript of the witness's testimony, there was no suggestion that the jury was unable to reach a verdict prior to asking for the transcript, and no circumstances indicated that the jury intended to emphasize specific testimony over other evidence.  *Id.* at

- 19 -

1143-44. And it established the prophylactic rule that courts providing transcripts of trial testimony must include an instruction "cautioning the jury on the proper use of that testimony," although it noted that the court's failure to do so in that case did not amount to plain error. *Id.* at 1145.

Similarly, the Sixth Circuit in *United States v. Harvey* upheld a lower court's decision to read portions of a witness's testimony in response to the jury's discrete factual questions. 653 F.3d 388, 397 (6th Cir. 2011). In *Harvey*, the jury asked for testimony regarding "the dates that guns were confiscated," whether officers took notes during their interview with the defendant, and when the defendant said that he had exchanged money for a gun. *Id.* The court held that reading back portions of testimony to answer the jury's questions is generally not an abuse of discretion where "the jury's factual questions are very specific and definitive answers can be easily located in the record, such as questions about specific dates and times where such facts are not disputed." *Id.* at 398. It further noted that providing testimony on specific issues in that case did not risk unduly emphasizing the testimony any more "than the jury [had] already done in framing the question." *Id.* Finally, the court noted that any danger resulting from reading from the transcripts was sufficiently cured by the court's cautionary instruction. *Id.*

Here, the answer to the jury's question regarding use of a drug dog on Cabrera's luggage was proper because there was minimal risk that the jury would unduly emphasize the testimony contained in the Court's answer. Like in *Harvey*, the jury asked a specific, factual question and the response to which was undisputedly correct. Although the attorneys did not agree with the Court's decision to respond to the jury's question, counsel for the parties expressly stated that they agreed with the substance of the answer provided. Additionally, the

- 20 -

Court limited the scope of its answer by stating that TFO Hart testified that a drug dog "was used" during the search of Cabrera's luggage, without indicating whether the drug dog alerted to the presence of narcotics.

The defendant suggests that, because the jury deliberated for over three hours before asking its question, the answer provided was likely key to its decision to find Cabrera guilty. However, after the Court responded to its question, the jury continued to deliberate for an additional hour and later asked a second question on an unrelated issue. [*See* Record Nos. 244, p. 11, 245, p. 14.] By the defendant's logic, the record of the jury's subsequent deliberations demonstrates that the answer to its first question was not key to its ultimate determination, minimizing the risk that it "place[d] inordinate emphasis on [the] testimony [in the Court's answer]." *Rodgers*, 109 F.3d at 1144 (citing *United States v. Padlin*, 787 F.2d 1071, 1076-77 (6th Cir. 1986)). Finally, like in *Harvey*, the Court lessened any risk that the jury would take the evidence provided out of context by including cautionary instructions "urg[ing] the jury to rely primarily on its collective memory." 653 F.3d at 398.

### III. Conclusion

Defendants Tajwar and Cabrera are not entitled to acquittal of their convictions. The United States presented substantial evidence from which a reasonable jury could readily, easily, and rationally conclude that each conspired to launder drug proceeds and engaged in promotional money laundering. Next, the government was not required to provide an audio recording of TFO Morris' interview with Tajwar earlier in the proceeding under *Brady*. Finally, the Court's response to the jury's factual question does not justify granting Cabrera's motion for a new trial. Accordingly, it is hereby

**ORDERED** that Defendants Tawsif Tajwar and Claudio Cabrera's motions for a judgment of acquittal or, in the alternative, for a new trial [Record Nos. 229, 230, 232] are **DENIED**.

Dated: May 17, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky